Filed 2/3/23 Tyler C. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| In re TYLER C. et al., Persons Coming Under the Juvenile Court Law. | B316341 |
| | Los Angeles County Super. Ct. No. 18LJJP00613 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| T.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael C. Kelley, Judge. Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

Mother T.C. appeals the juvenile court's order terminating parental rights to her children. She does not challenge the merits of the juvenile court's decision to terminate her rights. Mother's contention is that the Los Angeles Department of Children and Family Services (DCFS) did not comply with its initial duty of inquiry under Welfare and Institutions Code[1] section 224.2, subdivision (b) in that DCFS failed to ask available maternal extended family members about Indian ancestry within the meaning of section 1903 of the federal Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)

We find DCFS erred in failing to question Mother's family despite having contact with many of her relatives, including her own parents, sisters, grandparents, and aunts. (No fathers or paternal relatives were involved in this case as the whereabouts of the fathers were unknown.) Although Mother stated she had no Indian ancestry, we find the juvenile court erred in not personally inquiring of the numerous maternal relatives about their ancestry. However, we conclude, as explained below, the error was harmless because the children's designated adoptive parent was their maternal step-grandmother and the record otherwise reveals no reason to know that the children may have Indian ancestry.

**BACKGROUND**

On September 17, 2018, DCFS filed a section 300 petition alleging Mother had "brandished" a gun in the presence of two of her three children, threatened a family member, and broke the living room window causing glass to shatter. The petition alleged

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

the children (a nine-year-old boy and twin seven-year-old girls) were at risk of abuse or neglect as a result of the incident with the gun. The second count under section 300, subdivision (b) alleged Mother had a history of substance abuse and was currently using marijuana, such that she was unable to supervise and care for her children. On October 16, 2018, DCFS filed an amended petition which modified the (b) count. The petition alleged Mother had emotional issues stemming from childhood trauma which manifested in assaultive behavior and anger management issues. As a result, Mother allegedly self-medicated with non-prescribed substances.

At adjudication on October 16, 2018, the court struck the count involving the gun incident and found true the allegations involving substance abuse and childhood trauma. The juvenile court removed the children from Mother and ordered reunification services and suitable placement. On October 18, 2019, DCFS filed a second petition with new allegations which the court sustained on December 20, 2019. In January 2021, over two years since the initial petition had been filed, the court ended Mother's reunification services. On November 12, 2021, the court terminated Mother's parental rights, found the children adoptable, and ruled the parent-child bond exception to termination of parental rights did not apply. The children's maternal step-grandmother Rosalyn C. was designated their prospective adoptive parent.

As for Indian ancestry, at the detention hearing on September 17, 2018, Mother filed an ICWA-020 form, checked the box stating, "I may have Indian ancestry," and handwrote "Tribe unknown." At the hearing, Mother stated "My grandmother was mixed with Indian." The court asked her if there was someone

3

else who would have information about this ancestry and Mother said no. Maternal grandfather and maternal great aunt were both present at the hearing and the court did not ask either of them about Mother's claims of possible Indian ancestry. Mother also stated she did not believe either of the alleged fathers had Indian ancestry. The court found ICWA did not apply.

On October 5, 2018, Mother definitively told DCFS she did not have Indian ancestry and she stated that to the court as well on October 16, 2018. Local maternal relatives contacted by DCFS and listed in its reports include maternal great aunt A.H. (with whom the children were initially placed after removal from Mother); maternal great aunt T.J.); maternal grandfather K.C.; maternal grandmother T.T.; maternal step-grandmother Rosalyn C. (with whom the children stayed to give a break to caretaker step-great-grandmother S.S.); maternal aunt T.C.; maternal great grandmother Phyllis; maternal step great grandmother S.S. (with whom the children were placed). Maternal grandfather and a maternal aunt attended the detention hearing. Maternal grandfather also testified at the jurisdiction and disposition hearing.

None of these family members was ever asked about Indian ancestry. Based only on Mother's incomplete knowledge of Indian ancestry as stated on her September 17, 2018 ICWA-020 Form and on Mother's later denial of both maternal ancestry and paternal Indian ancestry as to both fathers, the court found no reason to believe the children had Indian ancestry. This appeal followed.

4

## DISCUSSION

Mother contends the order terminating parental rights should be reversed because DCFS did not inquire of her extended family members about the children's possible Indian ancestry.

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know the child is an Indian child. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883.)

As our Supreme Court has recognized, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement,

5

usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.' " (*Id*. at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.)

ICWA authorizes states to provide even more protection than the federal statute provides. In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings. (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) The child protection agency, in this case DCFS, must complete the Indian Child Inquiry Attachment form ICWA-010(A) and attach it to the petition. (Cal. Rules of Court, rule 5.481(a)(1).)

Here DCFS did not fulfill its duties under section 224.2 as it did not ask extended maternal family members about Indian ancestry, despite having contact information for and extensive discussions with several relatives. The next question is whether the error was prejudicial. A prerequisite to reversal of a trial court's decision under California law is s showing of a miscarriage of justice. (Cal. Const., art. VI, § 13.)

We find no miscarriage of miscarriage of justice. ICWA itself sets out placement priorities. Section 1915 of title 25 of the United States Code provides that in any adoptive placement of an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (1) a member of the child's extended family; [¶] (2) other members of the Indian child's tribe; or [¶] (3) other Indian families." (25 U.S.C. § 1915(a); *In re J.W.* (2022) 81 Cal.App.5th 384, 391.) The term "extended family" has been defined as including the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2).) California has adopted the same definition. (§ 224.1, subd. (c).)

In this case the children's maternal step-grandmother, Rosalyn C., whom DCFS describes as a "Relative," has been designated their prospective adoptive parent. According to DCFS, Rosalyn C. "has maintained a relationship with the children since they were born [and] the children appear to have developed a secure attachment to the prospective adoptive applicant." DCFS went on: "The children appear to be thriving in the home of the prospective adoptive applicant. [Rosalyn C.] has demonstrated that she is capable of meeting the needs of the children and has been diligent and consistent in assuring the

7

children continue to have all of their needs met." When asked, all the children reported they wanted to live with Rosalyn C.

Although the statutes do not address "step-grandparents" per se, we conclude the statute would include such relatives in its scope under the circumstances of this case. Here the juvenile court designated the children as adoptable by their maternal step grandmother, who "has been a part of their lives since they were small." The adoptive parent was also familiar with the children because her own mother, S.S., had been acting as their caregiver during part of the lives and during part of the proceedings, with Rosalyn C. substituting as caregiver when necessary. DCFS reported the children are "thriving" in Rosalyn C.'s home. Perhaps the Legislature did not conceive of a step grandparent, as opposed to a step parent, having a lifelong connection to children in dependency proceedings, but here the record is replete with evidence of the close physical and emotional connection maintained with the children by multiple generations of Mother's family. As a result of this unusual family configuration and because of the juvenile court's finding that adoption by Rosalyn C. would be in the children's best interest, they are not in danger of being separated from maternal relatives they have known their whole lives, an evil ICWA was enacted to prevent.

Mother does not argue that her children's proposed adoption by their maternal step grandmother is contrary to their best interest or lacks good cause. The juvenile court's proposed adoption plan for the children belies a finding of prejudice under ICWA. The abuses ICWA was enacted to prevent are not in play here.

8

Alternatively, applying the rule for assessing prejudice as set forth in *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578, we find nothing in the record to indicate Mother's denial of Indian ancestry was ill-informed, unfounded, or incorrect. Mother was raised by her mother and father and denied experiencing abuse or neglect. During the proceedings, she was living with extended family members, many of whom were contacted about the dependency case, including her own father, her sisters, her aunts and her own grandparents and step grandparents. Indeed, DCFS reported, "The family has a very strong support system and maternal grandparents are willing to do all it takes to have the children remain together and well cared for." Family members were close enough to Mother, who suffered seizures, to be concerned that her behavior was the result of undiagnosed multiple sclerosis, which had caused Mother's grandmother's death. Mother's familiarity with and continuous contacts with her own biological family distinguish this case from *In re A.C.*, where the mother was isolated from her biological family at a young age. We find no miscarriage of justice.

## DISPOSITION

The trial court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                STRATTON, P. J.

I concur:

HARUTUNIAN, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**WILEY, J., Dissenting.**

The miscarriage of justice is cutting tribes out of the child placement process.

Tribes asked our Legislature to require agencies like the Department to ask extended family members about a child's possible Indian ancestry.

Tribes identified the problem. Questioning only the parents about Indian ancestry was not enough. "[T]here are a variety of reasons why relying on the parents does not necessarily protect the child's best interests, or the rights of the tribe. Parents may simply not have that information, or may possess only vague or ambiguous information." (California ICWA Compliance Task Force, Report to the California Attorney General's Bureau of Children's Justice, 2017, p. 28 <https://caltribalfamilies.org/wp-content/uploads/2020/12/ICWAComplianceTaskForceFinalReport2017.pdf> [as of Feb. 1, 2023], archived at <https://perma.cc/NYF6-VPY9> (Tribal Report).) Parents "may be fearful to self-identify" or may "wish to avoid the tribe's participation or assumption of jurisdiction." (*Ibid.*)

Acting on the basis of the Tribal Report, the Legislature unanimously passed the 2018 amendment requiring agencies like the Department to ask *extended family members* about a child's possible Indian ancestry. (See, e.g., Cal. Health and Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.) prepared for Governor Brown (Aug. 31, 2018 & Sept. 4, 2018) pp. 5-6.)

The Legislature enacted this amendment to help tribes get information that would enable them better to preserve their cultures. In light of the last 500 years of history, denying tribes the benefit of this information is a miscarriage of justice.

1

Placement with maternal family members does not prove harmlessness.  (*In re Oscar H.* (2022) 84 Cal.App.5th 933, 938–940 [portion of opn. not joined by a second justice].)  Placement with a relative can still mean harm to tribes, particularly where (as here) the relative does not acknowledge any tribe.  If the relative does not acknowledge this heritage, how is it carried forward?

"A tribe's rights are independent of the rights of other parties."  (Tribal Report, *supra*, p. 71.)  A parent cannot waive the tribes' rights.  (*Ibid.*)  The injustice inherent in tribes not being fairly included in state court can be overcome only by ensuring tribal participation.  (*Id.* at p. 94.)

This is my 17th dissent on this topic.  The persistence of this issue is remarkable.  The Department could eliminate this issue by complying with the 2018 amendment.


WILEY, J.

2